DOOLEY (GORDON v.). See Case No. 5,607.

## Case No. 3,997.

DOOLEY et al. v. The NEPTUNE'S CAR.

[Hoff. Op. 69.]

District Court, N. D. California. Sept. 10, 1860.

SEAMEN—DISCHARGE—SHIPPING ARTICLES—PROOF OF EXECUTION.

[1. Where seamen claim their discharge on arrival at a given port, the mere production of

shipping articles for a longer voyage, bearing their names, coupled with the fact that, on the reading thereof to them, they do not each for himself declare that they did not sign the articles, is not sufficient proof that the articles were originally explained to them, as against their testimony that they were told by the shipping master that the voyage was to the port in question.]

[2. When it appears that seamen have shipped at different dates, the fact that the name of the shipping master is written up and down opposite the column of signatures to the shipping articles, and not opposite any individual signatures, shows that their names were not affixed on the date of execution, and raises an inference that it was without their assent, and hence prevents the shipping master from being a competent attesting witness.]

[3. A master who intends to strictly enforce the terms of the shipping articles should, in order to avoid difficulties in the proof of execution, cause the same to be read and fully explained to the crew before sailing, and take their acknowledgment thereof in presence of his officers or other reliable persons on board.]

[Libel by Thomas Dooley and others for seamen's wages. Decree for libellants.]

E. H. Hodges, for libellants.
J. B. Manchester, for claimant.

HOFFMAN, District Judge. The libel in this case is for seamen's wages. The service is admitted. The defense set up is a forfeiture of wages by desertion. The men are shown to have left the ship immediately on her arrival. The shipping articles are produced, and the voyage is described therein as "from New York to San Francisco; thence to any port or ports in Pacific or Indian oceans, or China seas, or Europe, as the master may direct; and thence back to an Atlantic port of discharge in the United States, for the full term of eighteen months." Under this agreement, if signed and fairly entered into by them, the men were clearly bound to remain by the ship, under penalty of forfeiture of wages if they deserted. The question, therefore, is, are they shown to have made the contract?

The proofs of the execution of the articles offered by the claimants, consist of (1) their production and identification as the shipping articles for the voyage; (2) the fact that the men came in the ship in the capacities therein specified; (3) a kind of tacit admission claimed to have been made by them after the ship's arrival at this port. With respect to this last item of proof the facts appear to be as follows: On the morning after their arrival the crew came aft and demanded their discharge. This the master declined to give them, saying that he had fulfilled and should fulfill his part of the contract, and that he expected them to fulfill theirs; and that if they left the ship they would do so on their own responsibility. The articles were then read to the men. They did not deny having signed them, but some of them said that all articles read alike, and that it was customary to discharge the crews at San Francisco. The master also states that at the time the

articles were sent to the shipping master, and before any of the crew were shipped, the heading was filled up precisely as it now appears. On the other hand several of the crew testify as to the mode in which their companions were shipped. It appears that Peterson and Brown shipped at the same time. They were passing by the shipping office, and were called in and asked if they wished to go in the Neptune's Car to San Francisco, and they replied that they did, and inquired the rate of wages. They were told that the wages were $12 per month. The shipping master or his clerk then wrote their names down, and they touched the pen. They were not asked to write their names, nor were the articles read to them. It was not stated to them that the voyage was to be continued beyond San Francisco, or that they were to remain by the vessel eighteen months. The manner of shipping Muntage and Rivers was, in all respects, similar, except that when these men touched the pen or made their marks, their names were written upon a paper which lay open before them, and which they supposed to be the articles. They did not read them, nor were they informed that their service was to be on any voyage but that proposed to them, viz. "From New York to San Francisco." Muntage also swears that when the captain read the articles to them on the morning they left the ship, they told him that they had not signed articles to that effect, and that they thought the voyage terminated at San Francisco. With regard to the execution of the articles by the other men, no proof whatever is produced other than the production of the articles, and the alleged tacit admission of their execution, as has been stated. No one of the libellants appears to have signed his own name. It is a fair presumption that a large majority of them are unable to read or write.

The question then arises, can the court enforce the forfeiture claimed in this case, on the ground that the crew has entered into a contract for a voyage which has not terminated, and that they have deserted? As this case is but one of a class which is frequently brought before the court, the occasion seems a fit one for the court to indicate what is the nature of the proof which should be offered as to the execution of these contracts. It is well known that the wages of seamen are much higher on this coast than on the Atlantic side of the continent. The temptation to desert and obtain greatly enhanced wages, rather than to continue a voyage around the world for a period of one or more years, at the wages at which the men were shipped, is great, and usually irresistible, to the seamen. For a crew to continue on board the vessel at the wages mentioned in the articles is a very rare occurrence. The master, knowing the men will desert, usually discharges them, and it has been for several years the general custom not to insist upon the forfeiture of

the whole wages, but merely on a deduction of a small sum to defray the expenses of shipping other men, if the old crew are unwilling to remain on board at port wages. It occasionally happens, however, that the master, as in this case, sees fit to insist on the forfeiture which the law decrees as the penalty for desertion. In the suit for wages, the defense of desertion is set up, and it is almost always met by the allegation that the articles were not read to the men, and that they were deceived as to the nature of the voyage. These allegations are in many instances supported by the testimony of numerous witnesses who swear to what was said and done at the time their companion shipped,—an accommodation which is reciprocated by his proving the mode in which they were shipped. Aware as the court is of the recklessness of this class of men, and the little reliance that can in general be placed on their oaths, especially when testifying for each other, it is frequently not easy to determine how far their statement is true. That they are often deceived by the shipping master is no doubt true. The anxiety on the part of the latter to obtain a crew; his knowledge of the usual indifference or recklessness of sailors; and perhaps the fact that crews are in a large majority of cases paid off and discharged at this port, whatever be the voyage stipulated for in the articles,—all these causes must frequently lead shipping masters to misrepresent the voyage to the men, and to procure them to affix their names or their marks to contracts which they do not understand, and into which they do not mean to enter. The facility for such practices in the case of an illiterate seaman, unable to read the articles, and the temptation to commit the fraud, are too great to permit us to hope that it is not of frequent occurrence. On the other hand, the notorious character of seamen compels us to admit that their testimony to the effect that the voyage was misrepresented would usually be forthcoming, whatever might be the true facts of the case, especially if it were once understood that such testimony would secure them their discharge and their wages.

It is much to be regretted that the mode of shipping seamen is not more carefully regulated by law. If every crew were required to be taken before an officer of the United States, appointed for the purpose, whose duty it should be to explain fully the contract to each of the men, to take his acknowledgment of its execution, and to certify those facts under his seal and signature, which certificate should be final and conclusive evidence, the seamen would obtain a protection which is often required by them, and the masters would have an assurance of their legal rights which at present it is difficult to obtain. But in the absence of such legislation it is the duty of the court to exact such proof of the execution of the contract, and to give to testimony, as to deception and fraud practiced upon the men, such weight, as the rules of law require. It is contended that this contract should be proved by the subscribing witness. Such undoubtedly is the general rule with regard to attested documents. But a subscribing witness is one who witnesses the execution of the instrument, and who affixes his name as a subscribing witness at the time of execution, and with the assent of the party whose signature he attests. A subsequent acknowledgment of the execution to a witness who thereupon, with the assent of the party, attests it, though long after the execution, will also, it seems, be sufficient to make the person so attesting a subscribing witness within the rule which requires him to be called. 3 Wash. C. C. 32, 42 [Munns v. Dupont, Case No. 9.926]; 9 Cow. 94, 113. But persons who put their names to an instrument subsequently to its execution, and without the assent of the parties, are not subscribing witnesses within the rule. On the articles in this case the name of the shipping master, Josiah N. Clark, appears twice, written in the column headed: "Witness to Signing." He seems to have signed in the double capacity of commissioner for the state of California and notary public, and his seal as commissioner is affixed to one of his signatures. The signatures are not written opposite the name of any particular seaman, but up and down the column. As the men appear to have shipped at different dates, it is obvious that their signatures, even if otherwise sufficient to make the person signing a subscribing witness to the contract, were not made at the time of its execution, nor probably with the assent of the seamen. I do not, therefore, think that even if the general rule which requires the subscribing witness to a private writing to be called, or his absence accounted for, applies to contracts of this class, the person who has affixed his name to these articles should be considered a subscribing witness within the rule. But even if he were adjudged to be a subscribing witness, such a ruling would in no way obviate the difficulties of the case; for, the witness being beyond the jurisdiction of the court, proof of his handwriting would be admissible. This proof could, in the case of a shipping master, doing a large business in New York, no doubt, be readily furnished. The technical proof of the execution of the instrument would thus be afforded, but the moral evidence of the fact that the men executed the contract with a knowledge of its contents would in no degree be strengthened by proving the handwriting of the very person by whom the alleged concealments or deceptions must have been practiced, if at all. It is, perhaps, doubtful whether the rule requiring an attesting witness to be called or his absence accounted for, and also that which admits evidence of his handwriting as the next best proof of authenticity, should be applied to this class of cases.

In Hall v. Phelps, it was held that in certain cases it was not necessary to call the

subscribing witness. but that other evidence of the existence of the instrument may be given in the first instance. 2 Johns. 451. And now if this principle be, as has been suggested (3 Johns. 478; 2 Wend. 576,) restricted in New York to negotiable paper, it would seem that for analogous reasons it ought to be extended to shipping articles. But, even if the instrument were in this case authenticated by proof of the handwriting of the subscribing witness, such evidence would not be conclusive. The inquiry would still be open, whether in fact the parties did sign the articles, or authorize their marks to be affixed to it, and whether its contents were misrepresented, or any other imposition practiced upon them. The master should therefore be prepared to produce satisfactory proof that the articles were fairly and intelligently executed by the men. Such proof can readily be furnished. If, before sailing, the articles are read over to each of the crew, their conditions and obligations fully explained, and an acknowledgment of their execution obtained by the master in presence of his officers or other reliable persons on board, and if one or more such persons thereupon sign them, with the assent of the men, as attesting witnesses, the master will always have all the proofs which the technical rules of law or which reason can require. When it is considered that the fulfillment of this contract can be exacted by force,—that the seaman is liable to imprisonment, and to be treated as a criminal, if he endeavors to evade the service he has contracted to perform; that that service is frequently to continue for two or even three years; and that, if he abandons it without justification, all his earnings up to the time of his desertion are forfeited,—it surely does not seem unreasonable to require of the cautious, or even just, master, who intends to enforce his rights, that he should satisfy himself and obtain evidence that the seaman has. in fact, agreed to the contract with a knowledge of its obligations and conditions, and not blindly to trust the assurances of the shipping master—who is certainly interested, and may be unscrupulous—that the men have been made to understand and have voluntarily executed the agreement. Aware, as the master is, of the strong temptation to impose on the men, to which the shipping master, interested in filling up the crew list. is subjected. and of the facility with which such impositions may be practiced, especially on illiterate men; conscious, too, of the rigor of the penalties he intends to enforce in case the contract be violated,—such a precaution would seem to be the dictate, not merely of policy, but of justice. The courts would thus be relieved of much doubt and embarrassment, and. in cases of violation of the agreement. could decree a forfeiture of wages with a reasonable certainty that the contract had been fairly entered into and willfully broken. In the case at bar no such proofs are offered. There is no evidence that the contract was explained to any of the men who appear to have made their marks, and the majority of whom were probably unable to read. There is no proof except as to four of them that they authorized any one to write their names to any paper, or that the marks were made by themselves. The only evidence offered is the fact that they composed the crew, and that on their arrival here, when the articles were read to them, they did not each for himself declare that he had not signed such a contract. No one acquainted with the habits of seamen could attach much force to their silence under such circumstances. Being illiterate, it was impossible for them to know what contract they had signed. The most they could say was that the shipping master had told them the voyage was to be to San Francisco; and this, one witness swears, they did state to the master.

Before the court can decree the wages to have been forfeited by desertion, it must be satisfied that the contract was really made by the men. The evidence on this point I find wholly insufficient. Nor can I conceive that when congress, solicitous for the protection of seamen, enacted "that no master should carry out any seamen without an agreement or contract being first made and signed by him," intended that the mere production by the master of articles bearing the names of his crew should be sufficient proof that the provisions of law had been complied with. The object of the law was to provide that a written contract should be entered into and signed by the persons composing the crew. Unless the signatures be proved, the document cannot be considered as shipping articles. To consider that a paper containing a list of names of persons who compose the crew is evidence, when produced by the master, who received it from a third person, that the men had signed it, would be to nullify the statute.

It was also contended by the counsel for the libellants that the men were justified in leaving the ship, on the ground that the master intended to proceed on a voyage to the Chincha Islands for guano, and that no such service was stipulated for in the articles. This point it is not necessary now to decide. It may be observed, however, that though the courts have in some former decisions considered such a voyage as so unusual and out of the common course of commerce, and as imposing such additional and severe labors on the crew, as to make it proper that it should be explicitly provided for, yet it would seem from the evidence that such voyages have recently become, especially at this port, the most common voyages undertaken by vessels arriving from the east. It is testified that more than half of the whole number that arrive here sail to the Peruvian or other islands in the Pacific for guano; that the duties of the crew are not more onerous than on other voyages, the cargo being always loaded by men hired for the purpose; that

the rate of wages is the same as on other voyages, and the service as readily undertaken by seamen as any other. If such be the facts, the reason for the former decisions would seem to have ceased. But all difficulty on the subject could be obviated by inserting in the shipping articles a provision for such a voyage, if required by the master. This, out of abundant caution, it would in all cases be advisable to do. A decree must be entered in favor of libellants for the wages due them separately.